**UNITED STATES**

v.

**Gregory L. BELL, Private First Class
(E–2), U.S. Marine Corps.**

**NMCCA 200200404.**

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 25 July 2000.

Decided 30 June 2004.

Lt Colin Kisor, JAGC, USNR, Appellate Defense Counsel.

Lt Christopher Burris, JAGC, USNR, Appellate Government Counsel.

Lt Jason A. Lien, JAGC, USNR, Appellate Government Counsel.

Before DORMAN, Chief Judge, VILLEMEZ, and HARRIS, Appellate Military Judges.

DORMAN, Chief Judge:

The appellant was convicted by a general court-martial of a conspiracy to steal, two specifications each of making a false official statement and larceny, and single specifications of graft and using cocaine. The appellant's offenses violated Articles 81, 107, 112a, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 907, 912a, 921, and 934. The military judge imposed, and the convening authority (CA) approved, a sentence that included confinement for 12 months, forfeiture of $400.00 pay per month for 12 months, reduction to pay grade E–1, and a bad-conduct discharge. In taking action, the CA complied with the terms of the pretrial agreement and suspended that portion of the approved confinement in excess of 10 months for a period of one year from the date of his action.

The appellant has assigned a single assignment of error. It reads:

APPELLANT WAS PREJUDICED BY THE GROSSLY NEGLIGENT POST-TRIAL PROCESSING OF HIS CASE IN THAT: (1) THE RECORD OF TRIAL WAS NOT AUTHENTICATED UNTIL NINE MONTHS AFTER THE TRIAL AND AFTER APPELLANT WAS RE-LEASED FROM CONFINEMENT AT THE END OF HIS SENTENCE; AND (2) THE STAFF JUDGE ADVOCATE DID NOT PREPARE HIS RECOMMENDATION UNTIL ALMOST EIGHT MONTHS LATER AFTER APPELLANT WAS RELEASED FROM CONFINEMENT, WHERE APPELLANT HAD SUBMITTED A TIMELY CLEMENCY PETITION REQUESTING CLEMENCY IN THE FORM OF EARLY RELEASE FROM CONFINEMENT.

Appellant's Brief of 25 Mar 2003 at 3. Although not assigned as error, we have also determined that an issue of prior punishment is also present in this case.

We have carefully reviewed the record of trial, the appellant's assignment of error, the Government's response, and all the supplemental pleadings of both the appellant and the Government. We have also considered the excellent oral arguments presented by the appellate counsel, in Rickover Hall at the United States Naval Academy, on 24 February 2004. We conclude that there is merit in the appellant's assignment of error, and that the appellant is also entitled to credit for prior punishment. We will take corrective action. Following that corrective action, we conclude that the findings and sentence are correct in law and fact and that no error remains that is materially prejudicial to the substantial rights of the appellant. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

**Facts**

On 19 October 1999, the appellant was awarded nonjudicial punishment (NJP) for violations of Articles 81, 92, and 121, UCMJ, 10 USC §§ 881, 892, and 921, that occurred on or about 30 July 1999. These offenses concerned the appellant's fraud involving his entitlement to his basic allowance for quarters. Of the punishment awarded at the NJP, only a one-grade reduction in rank was executed. On 25 July 2000, the appellant was tried by the general court-martial now before us for review and convicted of several of the same offenses for which he had received NJP.[1]

1. At oral argument the Government conceded that the appellant was entitled to credit under

On 6 January 2001, the appellant submitted a clemency request, addressed to the CA and sent via the staff judge advocate (SJA). This request sought a 2–month reduction in the sentence to confinement. In this request, the appellant also mentioned that his family had not received the $300.00 per month he had expected they would receive, and he alleged that he was being harmed by the failure of the Government to provide him with a copy of the record of trial. In his request, the appellant specifically cited *United States v. Collazo*, 53 M.J. 721 (Army Ct. Crim.App.2000) for the proposition that delay in the review process could be the basis for reducing the appellant's sentence. The appellant's request for clemency was not forwarded to the CA at this time. On 31 March 2001, the appellant was released from confinement on his normal release date.

Almost 2 weeks after the appellant was released from confinement, the trial defense counsel reviewed the record of trial. Then, on 18 April 2001, the military judge authenticated the 106–page record. Almost 7 months later, on 8 November, the SJA signed his recommendation (SJAR) to the CA. The trial defense counsel responded on 15 November that she had no matters to submit in response to the SJAR. On 18 December, the SJA prepared an addendum to his SJAR, forwarding the case to the CA for action. In his action of 7 January 2002, the CA noted that he had considered the appellant's request for clemency, that had been submitted more than a year before, but he did not grant any clemency. The action taken was consistent with the SJAR, and the terms of the appellant's pretrial agreement. There is no evidence that the CA was even made aware of the appellant's request for clemency prior to the date of the action.

Although the SJAR does not contain any explanation for the delay in processing this case, the Government submitted an affidavit of the SJA dated 21 January 2004. In general, the SJA blames the Government's inability to produce a more timely record and action upon understaffing of court reporters, as well as upon the wide geographic area and the large number of commands he is obligated to advise. In essence, the SJA for Marine Reserve Forces has convening authorities spread out all across the United States.[2] He also stated that it was the normal practice that requests for clemency were not forwarded to the CA until such time as the record was forwarded to the CA for action. SJA Affidavit of 21 Jan 2004 at 2–3. The SJA also stated that "[r]equests for clemency seeking suspension of sentences, submitted to the convening authority before authentication of the record of trial, are processed as requests to hurry the review process to permit a decision on the request for suspending the sentence." *Id.* at 3.

## Discussion

In his assignment of error, the appellant asserts prejudice based primarily upon the length of time it took to prepare an authenticated record of trial, and then the time it took for the SJA to prepare his SJAR. While we are sympathetic to the understaffing issues faced by the SJA, the Government is still responsible for its case management. *See Diaz v. Judge Advocate General of the Navy*, 59 M.J. 34, 38 (C.A.A.F.2003). In spite of this understaffing, we take this opportunity to once again remind SJAs that they, not their office staffs, are responsible for the quality, accuracy and—dare we say it—the timeliness of their office's work product. *See United States v. Kersh*, 34 M.J. 913, 914 n. 2 (N.M.C.M.R.1992).

 The issue in this case is essentially whether the appellant was denied a speedy review at the command level. Without question an appellant has the right to a timely review of the findings and sentence of his court-martial. *United States v. Tardif*, 57 M.J. 219, 222 (C.A.A.F.2002); *United States v. Khamsouk*, 58 M.J. 560, 561 (N.M.Ct.Crim.App.2003)(citing *United States v. Williams*, 55 M.J. 302, 305 (C.A.A.F. 2001)). Normally, before an appellant will be afforded relief stemming from a claimed denial of speedy review, the appellant "must demonstrate some real harm or legal prejudice flowing from that delay." *United States*

*United States v. Pierce*, 27 M.J. 367 (C.M.A.1989).

**2.** Both the CA and the SJA in this case, however, are located together in New Orleans, LA.

*v. Bell,* 46 M.J. 351, 353 (C.A.A.F.1997)(quoting *United States v. Jenkins,* 38 M.J. 287, 288 (C.M.A.1993)). Where the post-trial delay has been "excessive," however, the Court of Appeals for the Armed Forces has expressly held that we may grant relief "without a showing of 'actual prejudice' within the meaning of Article 59(a), if [we] deem[ ] relief appropriate under the circumstances." *Tardif,* 57 M.J. at 224. We have also been cautioned to "be vigilant in finding prejudice wherever lengthy post-trial delay in review by a convening authority is involved." *United States v. Johnson,* 10 M.J. 213, 218 (C.M.A.1981)(Everett, C.J., concurring in the result.) In this case, given the facts that the appellant pled guilty; that the record is only 106 pages long; that the appellant requested speedy review and specifically cited *Collazo;* that the SJAR is only eight pages long; and considering the content of the affidavit of the SJA, we find that this case involves excessive post-trial delay.

The appellant asserts prejudice, claiming that by not being provided an authenticated record of trial he was handicapped in the preparation of his request for clemency. He also asserts prejudice, because the CA did not consider his clemency package until after he was released from confinement. The appellant, however, has not detailed how he was handicapped in the preparation of his clemency request. The delay in preparation of the record did, however, substantially delay consideration of the appellant's clemency request. This is particularly so where the SJA did not initially treat the request for clemency as a request for clemency at all, but rather a request to speed the post-trial review process. SJA Affidavit of 21 Jan 2004 at 3. Yet even after the command received the appellant's request, action was not taken for over a year.

■ This is a case involving post-trial processing. The "essence of post-trial practice is basic fair play...." *United States v. Lowe,* 58 M.J. 261, 263 (C.A.A.F.2003)(quoting *United States v. Leal,* 44 M.J. 235, 237 (C.A.A.F.1996)). Basic fair play does not envision sitting on a request for clemency for over a year before forwarding it to the convening authority. We remind practitioners

of military justice that SJAs are advisors. When an SJA sits on a clemency request, as was done in this case, through inaction the SJA becomes the decision-maker. That is not the SJA's role. That is the role of the CA. Here the delay in presenting the appellant's written clemency request to the CA in a timely manner constituted a *de facto* denial of the requested clemency, and was error. In an unpublished case, former Chief Judge Sefton of this court, succinctly and accurately termed such action by the SJA as a "pocket veto" of the appellant's request for clemency.

We also remind practitioners of military justice within the Department of the Navy of their obligation under the United States Navy Regulations to promptly act upon individual requests. Article 1156 of the Navy regulations reads as follows:

> Requests from persons in the naval service shall be acted upon promptly. When addressed to higher authority, requests shall be forwarded without delay. The reason should be stated when a request is not approved or recommended.

U.S. Navy Regulations, Article 1156 (1990). Thus basic fair play, recognition that the SJA is an advisor and not a decision maker, and regulatory requirements all support the conclusion that the SJA erred in failing to forward the appellant's request for early release from confinement to the convening authority in a timely manner.

In requesting relief the appellant relies on several of our earlier unpublished opinions in which we granted relief under similar circumstances. The Government correctly argues, however, that unpublished decisions of this court do not establish "bright line rule[s] in all post-trial delay cases." Government Brief of 22 Sep 2003 at 3. The Government also urges us to adopt the position of the Army Court of Criminal Appeals in *United States v. Stachowski,* 58 M.J. 816 (Army Ct.Crim.App.2003).

In *Stachowski,* the Army Court addressed essentially the same issue as we now face. In that case a divided panel of the Army Court denied relief to the appellant. Private Stachowski was serving a 140–day sentence when he submitted a request to be released from confinement in time to attend the birth

of his child. His request was not forwarded to the CA, because the record had not been authenticated. Eventually, the SJA presented the case to the CA for action. In his recommendation, the SJA provided an explanation for the delay in preparing the 103–page record of trial. In taking action, the CA reduced Private Stachowski's sentence to confinement by 30 days to compensate for the 268–day delay in taking action in his case. On appeal Stachowski argued that the relief accorded him was "meaningless" and that he had been prejudiced by the delay because it "prevented him from attending the birth of his child." *Id.* at 817. In rejecting Stachowski's arguments the Army Court wrote:

> We decline to accept this rationale of prejudice. Accepting appellant's position would render all corrective action taken by a convening authority after an appellant has completed his sentence to confinement unacceptable, regardless of the circumstances. Appellant has no right to have his petition for clemency reviewed prior to authentication of the [record]. *See* R.C.M. 1104(e), 1106(d)(1), and 1107(b)(3)(A).

*Id.*

■ We agree with the Army Court that even after an accused has completed his sentence to confinement, convening authorities, as well as appellate courts, can fashion meaningful and appropriate remedies. However, under the facts of this case, we need not reach the question of whether the appellant had the right to have his request for clemency considered prior to authentication of the record. Citing basic fair play, the proper role of the SJA, the U.S. Navy Regulations, and the lack of a reasonable explanation for failing to promptly forward the clemency request in this case, we find that it was error for the SJA to fail to forward the clemency request to the CA in a timely manner when the appellant was seeking an early release from confinement. *See Collazo v. Welling,* 34 M.J. 793 (C.G.C.M.R.1992); *Stachowski,* 58 M.J. at 824 (Clevenger, J., dissenting).

We will not and cannot speculate concerning what the CA would have done had he been presented the appellant's request during a time in which he could have granted it. *See United States v. Craig,* 28 M.J. 321, 325 (C.M.A.1989)(holding that "speculation concerning the consideration of [clemency] matters cannot be tolerated in this important area of command prerogative.")(citing *United States v. Siders,* 15 M.J. 272, 273 (C.M.A. 1983)). Furthermore, presenting the clemency request to the CA long after the appellant had been released from confinement "is simply not qualitatively the same as being heard at the time a convening authority [could have granted the requested relief]." *Lowe,* 58 M.J. at 263. The changed time and conditions for granting the specifically requested clemency, prevented the CA from granting the requested clemency.

Having found that there was excessive delay in this case, and that the SJA erred in failing to forward the request for early release from confinement to the CA in a timely manner, we conclude that under the particular facts of this case, the appellant is entitled to relief under Article 66(c), UCMJ, as explained in *Tardif.* In that we do not know what the convening authority would have done if presented with the request at a time when the appellant was still confined, we will take corrective action in our decretal paragraph to ensure the removal of any taint of prejudice. In short, we will give the appellant, "the benefit of the doubt." *Chatman,* 46 M.J. at 324.

■■ The manner in which a request for clemency has been processed is a factor we will consider when reviewing allegations of a denial of speedy review as we apply the guidance contained in *Tardif.* Accordingly, we make the following recommendations:[3] (1) A request for early release from confinement should be forwarded to a CA in a timely manner so as to allow the possibility of favorable action, consistent with the request, if the CA elects to grant it; (2) Subsequent clemency requests, requesting essentially the same relief without a substantially different rationale supporting the request, need not necessarily be forwarded, depending on the specific circumstances of the case, until the case is submitted to the CA for his

---

**3.** We make these recommendations to reduce the likelihood of needless appellate litigation.

action under R.C.M. 1107; (3) In cases such as this the date the clemency request for early release was submitted to the CA should be documented in the SJAR or some other document attached to the record; and (4) Any response by the CA should be attached to the record of trial.

■ While it is in the best interests of military justice for the CA to respond to a request for early release, there is no legal requirement to do so. Accordingly, as applied to cases tried after the date of this decision, a CA's failure to respond after being presented with the request will be deemed a denial. The failure of the appellant to comment on a lack of response when submitting matters under R.C.M. 1106 will be deemed a "waiver" of the issue on appeal. "Counsel at the trial level are particularly well-situated to protect the interests of their clients" concerning this matter. *Tardif,* 57 M.J. at 225.

## Conclusion

Accordingly, we affirm the findings. Following our reassessment of the sentence, based upon our finding of error in the post-trial processing, as delineated herein, and in consideration of what "sentence 'should be approved,' based on all the facts and circumstances reflected in the record," *id.* at 224, only so much of the sentence as provides for confinement for 12 months, forfeiture of $400.00 pay per month for 12 months, and reduction to pay grade E–2[4] is affirmed.

Judge HARRIS concurs.

VILLEMEZ, Judge (concurring):

While concurring in Chief Judge Dorman's excellent opinion, I write separately to offer an analytical framework by which to examine issues of post-trial-processing delays. In doing so, I borrow liberally from opinions I previously wrote in two authored-but-unpublished cases: *United States v. Hurd,* No. 200201114, 2003 WL 21254251 (N.M.Ct.Crim.

App. 30 May 2003)(unpublished decision) and *United States v. Jones,* No. 200100066 (N.M.Ct.Crim.App. 22 May 2003)(unpublished decision).[1]

### "Fundamental Fairness"

One of this court's responsibilities is to ensure "due process" ("fundamental fairness") in the post-trial processing of courts-martial. *See Pennsylvania v. Finley,* 481 U.S. 551, 555–57, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). The evaluation of whether a procedure complies with the concept of "fundamental fairness" is not an exact science. In almost every case, to a large extent, the final determination will be fact-driven, as those "facts" are interpreted by the individuals sitting in these chambers on any given day. This court, however, should strive to develop an analytical process that comes as close as possible to the desirable goals of clarity and consistency in its decisions regarding issues of post-trial processing delay.

### Proposed Post–Trial–Processing–Delay Analytical Framework

The objective herein is to create an analytical framework that will ensure "fundamental fairness" and "meaningful access." The genesis and nature of the right to a timely and meaningful review and post-trial processing of one's court-martial—as discussed in depth in the *Jones* case cited above—when juxtaposed with that of the Naval Service's military mission, allows significant leeway in developing a procedure that incorporates concern and respect for all relevant interests. The high state of professional integrity in the Naval Service—in an environment that encourages, if not demands, the gentleman's and gentlewoman's practice of law, where professionalism and civility coexist—allows us the legitimate presumption that those responsible for post-trial processing of courts-martial will work each case in a fashion that is both "timely" and "reasonable" for that particular case, given an appropriate setting of mission priorities and the prioritizing of available assets.

---

4. Reduction to E–2, affords the appellant credit under *Pierce,* 27 M.J. at 369.

1. *Jones* contains a more extensive treatment of and an historical look at the issue than either

*Hurd* or this opinion. *Jones* also contains an appendix that discusses and reviews the significant post-trial-processing-related cases up to that point in time.

This basic presumption, however, may be met and, perhaps, overcome in any one of four different ways: (1) by any evidence of a malicious or intentional delay by an accountable party in the processing of a particular case; (2) by an unquestionably-long post-trial processing delay, preventing, in some specific manner, the appellant from obtaining a "meaningful" review of her or his court-martial; (3) by the appellant's presentation of some actual, articulated, specific, and verifiable personal prejudice caused or being caused by the post-trial processing delay; or (4) by shock-the-conscience-of-the-court circumstances in a given case.

The real key to this determination is the presentation of evidence of an appropriate level of articulated prejudice suffered by the appellant as a result of post-trial processing delay of her or his court-martial. Thus, given proper notice by the appellant of existing or evolving prejudice, the Government should take care to document and include in the record a rational explanation of the reasons or justification for the time consumed in processing that particular case, because—given the assertion of prejudice caused by the time it took to get the case here—this court will examine the issue very closely, to determine whether the delay, in fact, was *reasonable under the particular circumstances present.*

This procedure provides notice to the Government as to those cases in which an extra effort needs to be made to account for processing time, while it is still practical to do so. This is opposed to the alternatives of either trying to keep track of the reasons for the post-trial milestones in every case, which will turn out to be an unnecessary effort in most cases, or of being tempted to "gundeck" a timeline long after the fact, when the issue is raised at the appellate-review level.[2]

Finally, by the provisions of Article 66(c), UCMJ, as discussed by our senior court in *United States v. Tardif,* 57 M.J. 219, 220, 223–24 (C.A.A.F.2002), this court has the authority to grant relief *without* a showing of prejudice. This ultimate safety net to ensure that "justice" is done in a given case will only be used, however, as our senior court eloquently phrased the principle in *Tardif,* "as the last recourse to vindicate, where appropriate, an appellant's right to timely post-trial processing and appellate review." *Id.* at 225.

### Prejudice: The Talisman of Relief
### Notice of Prejudice

An appellant may suffer two types of prejudice due to post-trial processing delays: (1) that which hampers her or him in the preparation or execution of recognized defense-related activities; or (2) that which affects an appellant personally. In the infrequent circumstance that a rehearing of some type is required and "unreasonable" post-trial processing delay demonstratively has hampered the appellant's ability to present relevant and significant matters in her or his own behalf, the appellant, normally, will be granted some form of relief, whether or not the appellant provided notice of suffered prejudice prior to making the assertion at the appellate-review stage. If, however, the appellant fails to provide prior notice of a claim of some type of personal prejudice—such as difficulty in obtaining employment of choice due to a lack of finality in her or his case—making that claim for the first time at the appellate-review level, this court would not be as likely to grant any relief.

"Proper" notice of the appellant's perceived prejudice has to be in some form of "official" notification, in that it must be of a nature to reasonably inform or put the Government on notice of the suffered or ongoing prejudice resulting from the post-trial processing delay. Most commonly, it could be contained in a communication from the appellant's defense counsel to the convening authority (CA), via her or his staff judge advocate (SJA). If personally done by the appellant, however, it must be directed to someone in a position of authority, such as a commissioned officer, or a very senior enlisted member of the command or unit, such as

---

**2.** In the modern Navy, falsifying reports, records and the like is often referred to as "gundecking." Sometimes gundecking might not be a knowing falsification, but rather just not being sure of pertinent and relevant facts and just guessing, perhaps even an "educated" guess, but a guess held out to be a fact nonetheless. http://www.cpf.Navy.mil/facts/customs.html#gundecking.

the Command Master Chief in a Navy command or the Sergeant Major in a Marine Corps unit. A letter or phone call to a junior member of the command will not suffice to trigger the notice trip wire.

### Framework Considerations

All parties—including the Government, as well as the appellant—have an interest in the validation and finality of a court-martial, and all presumably will work towards those twin goals in a reasonable manner, given the specific circumstances currently confronting the command and individuals involved in the post-trial processing of a particular case. Quite frankly, the appellant has had his or her "day in court" and, presumably, was convicted only after a timely and proper trial. Unfortunately for the appellant, there are a number of adverse consequences that come with the circumstance of a criminal conviction. Not getting a DD–214 and, thus, finally severing all ties with the military, as quickly as she or he might like, may be one of those circumstances.

### Waiver and Forfeiture

Due to the nature of the issue of post-trial processing delays and the amorphous nature of the possible resulting prejudice, both of a personal and of a legal nature, which may develop anywhere along the timeline of the post-trial evolution, it is not possible to establish a bright-line rule of waiver or forfeiture. Additionally, the duties and responsibilities of this court under the provisions of Article 66(c), UCMJ, negate any *absolute* requirement for prior, timely notice of prejudice.

Thus, an appellant can assert post-trial-processing-delay prejudice for the first time at the appellate-review level, and the issue, *technically,* will not be considered as either waived or forfeited. Such an action, however, as noted above, will make the resolution of the issue in the appellant's favor much more difficult. The issue *should* be surfaced and presented as early as possible. As our senior court offered in *Tardif:*

> [W]e note that counsel at the trial level are particularly well-situated to protect the interests of their clients by addressing post-trial delay issues before action by the convening authority. Trial counsel can ensure that the record contains an explanation for

what otherwise might appear to be an unreasonable delay. Defense counsel can protect the interests of the accused through complaints to the military judge before authentication or to the convening authority after authentication and before action. After the convening authority's action, extraordinary writs may be appropriate in some circumstances.

*Id.* at 225.

### Appropriate and Meaningful Relief

While the path set out in this proposed analytical framework does not easily lead one to the promised land of sentence relief, when it does so lead, the sentence relief granted should be both *appropriate* and *meaningful.* Anything less will but serve to devalue the significance of an appellant's right to enjoy "fundamental fairness"—as that principle is defined and discussed both within this opinion and in *Hurd* and *Jones* as cited above—in the post-trial processing of her or his court-martial. The purpose should be to provide proper relief to the appellant commensurate with the "right" violated, not to "punish" or fine the Government for its apparent dereliction.

### Analytical Framework Summary

The primary point is that Navy and Marine Corps judge advocates and their staffs, even those primarily assigned to military-justice billets, may have other duties and responsibilities that demand their time and attention at the expense of working on a post-trial-processing matter. In placing priorities and weighing the cost and benefits, I believe the appropriate balance generally is struck. While the Naval Service leadership could assign more attorneys full-time to military-justice matters at all levels and stages of the process, in order to absolutely ensure the "right" of every convicted servicemember to a timely review and post-trial processing of her or his court-martial, that, realistically, will not happen; nor should it.

The military-justice system in this country is front-loaded to provide an accused with professional assistance and the full protections of her or his rights in every case, at no cost to the accused, with an emphasis on the

timely adjudication of alleged offenses. Post-trial rights and benefits are automatic, generous, guaranteed, and, generally, free of charge. As long as no malice is involved, if, for all the reasons already cited, there is, at times, less emphasis on speedy processing of cases post-trial, it will be viewed, generally, as either: a perhaps unfortunate by-product of the nature of the "right" involved;[3] a result of the demands of the military mission; a legitimate function of available and prioritized assets; or as merely one of the adverse consequences of being convicted of a crime.

The purpose of this proposed analytical structure is an attempt to provide a simple, clear, straightforward, common-sense-friendly approach to a most difficult issue. It is not intended, nor should it be read, as providing any type or form of an excuse or a justification for denying—due to carelessness, laziness, or a lack or failure of professional effort—a servicemember the timely and truly meaningful post-trial processing of her or his court-martial. Any one of these inexcusable cardinal sins will cause this court to take swift and significant corrective action. Again, the pulse beat of this proposed framework is the professional integrity of all those who have duties and responsibilities in the process.

### Application Of The Facts Of This Case To The Analytical Framework

Applying the facts of this case to this proposed analytical framework, relief is most warranted herein for the suffered post-trial processing delay. As described in Chief Judge Dorman's excellent treatment in the majority opinion, the details and post-trial events in this case provide a textbook example of both, in part, the right way and, in part, the wrong way to handle a post-trial-delay-processing issue. While the trial defense counsel did everything right for her client, the SJA did not do so well in serving his client, the CA. On 6 January 2001, the trial defense counsel put the Government on notice that the appellant was suffering specific prejudice by the delay in the post-trial processing of his case and, on the appellant's behalf, asked the CA, via his SJA, that the process be given "due diligence." Additionally, she passed on with appropriate comment the appellant's clemency request that he be released from confinement 2 months early. That request, apparently, was not even passed on to the CA by the SJA, until it had long been eviscerated by events and the mere passage of time ... a long time ..., as the appellant remained in confinement. It was not officially acknowledged and "acted" on by the CA until *a year and a day* after submitted by the trial defense counsel to the SJA; long after it had ceased to be a viable request.

I concur with Chief Judge Dorman's statement that this court will not speculate as to what the CA may or may not have done *if* he had received the appellant's request for an early release from confinement while the request was still alive with real possibilities. The appellant and his trial defense counsel gave appropriate and timely notice to the Government that the appellant was suffering specific prejudice as a result of the post-trial processing delay in his case, asking for basic "due diligence" in the processing effort. The Government has woefully failed to meet its burden and obligation to explain its continuing harmful-to-the-appellant delay in the post-trial-processing of his case.

While this court cannot give back to the appellant a day, or even a minute, of the 2 months of personal liberty—one of life's most precious commodities—that he *might* have been afforded, if he had been extended the basic leadership courtesy of a timely consideration by the CA of his early-release request, it is appropriate that we disapprove the bad-conduct discharge awarded the appellant.[4] This is not an act done in a cavalier

---

3. *See Jones*, as cited above, for a more detailed discussion. Generally, while an important, statutory and judicially-validated "right," the "right" to a "speedy" review of one's criminal conviction is not one of the constitutional bedrock rights contained in the Bill of Rights. *See United States v. Larneard*, 3 M.J. 76, 79 (C.M.A.1977). This

foundational difference affects the "attention" demanded by the nature of the "right."

4. This is a lesson in leadership as much as law. It is a case about perspective and trying to fully appreciate something we may not fully understand. In 1974, I was a brand new Navy lawyer, commonly referred to as a "JAG," going through

fashion by a panel of appellate judges sitting in plush chambers in Washington, D.C., far removed from real-time fleet operations and realities.[5] We do not do it because we can; we do it because we must. It is not a bureaucratic windfall to the appellant; rather, it is a necessary action to maintain the meaningfulness of the post-trial-processing procedure and, thus, the very integrity of the military justice system itself. The circumstances of this case demand that we do so, if a servicemember's right to due process in the post-trial processing of her or his court-martial really represents anything more than merely a catchy slogan on a colorful Law Day poster.[6]

Officer Indoctrination School in Newport, Rhode Island. As part of the course, my fellow neophyte JAG's and I went on a field trip to the old, now-closed Portsmouth Naval Prison. We went through the "normal" prisoner indoctrination and spent the day and night literally as inmates, culminating in spending the night in small, single cells in the "hardcore" cellblock of the prison. While that brief experience did not enable us to anywhere nearly appreciate what real prisoners experience, it did provide some useful perspective as to how our performance as lawyers, especially as defense counsel, might drastically impact someone else's life. It gave us a new appreciation for personal liberty and for choices, even if only deprived of them for a single day as part of a "controlled" object lesson. So much of one's perspective on an issue depends on her or his position and personal stake in the matter. Just as "low intensity conflict" must seem quite the misnomer if you are the one, even if the only one, at whom rounds are currently being directed, a request to be released from confinement is of the greatest importance to the one submitting it from behind bars. It most certainly deserves to be considered and acted upon in a timely and proper manner. More than that, however, is the basic leadership principle so eloquently stated long ago by General John A. Lejeune, USMC: "The relation between officers and men should in no sense be that of superior and inferior nor that of master and servant, but rather that of teacher and scholar. In fact, it should partake of the nature of the relationship between father and son, to the extent that officers, especially com-

manding officers, are responsible for the physical, mental, and moral welfare, as well as the discipline and military training of the young men under their command." *Marine Corps Manual*, 1920. *See* Colonel D. Heinl, Jr., editor: *Dictionary of Military and Naval Quotations* at 172.

5. There is a great wealth of "fleet" and general Navy–Marine Corps experience embodied in the appellate judges serving on this court, which is reflected upon and utilized daily in reaching often-difficult decisions, which always attempt to balance the scales of justice, both in the interests of the individual appellant and for the Government. On this panel alone, for instance, all three judges, Chief Judge Dorman, Judge Harris, and myself, each have more than 30 years of active-duty military service. Both Judge Harris and I have prior active-duty service as enlisted Marines. Judge Harris also proudly wears the Golden Wings of a Naval Aviator. Additionally, Chief Judge Dorman is the second most senior Colonel in the Marine Corps, and I am the most senior Captain in the Navy JAG Corps. Between the three of us, we are less than 4 years shy of having amassed a total of 100 years of active-duty experience in the Navy and Marine Corps. Thus, we each have a plethora of "been there, done that" experiences, but more importantly, we have not forgotten what it was like when we were "there" and actually "doing that," in our journeys from E–1 to 0–6.

6. *See United States v. Williams*, 55 M.J. 302, 305 (C.A.A.F.2001).